IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs July 19, 2022

**STATE OF TENNESSEE v. WILLIAM BENNING**

**Appeal from the Criminal Court for Knox County**
**No. 117565   Steven Wayne Sword, Judge**

_____

**No. E2021-00889-CCA-R3-CD**

_____

The Defendant, William Benning, pleaded guilty to second degree murder, and he was sentenced to twenty-five years in confinement.  On appeal, the Defendant argues that the trial court abused its discretion by imposing an excessive sentence.  After review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

JOHN EVERETT WILLIAMS, P.J., delivered the opinion of the court, in which ROBERT W. WEDEMEYER and CAMILLE R. MCMULLEN, JJ., joined.

Clinton E. Frazier, Maryville, Tennessee, for the appellant, William Benning.

Herbert H. Slatery III, Attorney General and Reporter; Hannah-Catherine Lackey, Assistant Attorney General; Charme P. Allen, District Attorney General, and Kevin Allen, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**FACTUAL AND PROCEDURAL HISTORY**

According to the guilty plea hearing transcript, Mr. Collin Davis, the victim, rented rooms of his home to people or allowed people to stay there.  He rented one room to Mr. John Williams, and the Defendant and his girlfriend, Ms. Kayla Hood, rented another room at the victim's home.  The victim would "come and go" but would sleep on a couch in the living room.  On November 6, 2019, the Defendant and the victim argued about some swords at the victim's home.  Mr. Williams, Ms. Hood, Mr. Grover Broyles, and Mr. Mark Hipsher were present at the home when the argument occurred.  The

witnesses informed law enforcement that the victim was "a heavy drinker." The victim's blood/alcohol ("BAC") was 0.24% when he died. The victim "would become combative when he was drinking," and the argument between the Defendant and the victim became physical. According to "all witnesses," the Defendant was "pretty easily physically confronting the victim, because he couldn't essentially defend himself." Mr. Williams informed law enforcement that the Defendant would strike the victim, the victim would fall to the ground briefly, and then the victim would get back up to fight again. During the altercation, the Defendant threatened the victim with the sword, and the victim was "hurt pretty badly." According to Mr. Broyles, the victim sustained a large laceration on his chest that required compression during the initial altercation. However, the altercation ended, and the victim was still alive when witnesses left the home.

Ms. Kayla Hood informed law enforcement that she had post-traumatic stress disorder and could not "deal with conflict and fighting." As a result, she went to her room when the fighting started and turned the volume of a movie up so she could not hear the fight. According to Ms. Hood, "the real fight started" after Mr. Williams and Mr. Broyles left. She "heard significant fighting going on out in the living room between" the Defendant and the victim and was afraid to come out of her room. She heard "punching and things of that nature and being knocked against walls." She watched the entire movie, which lasted an hour and forty-two minutes, before exiting her room. When Ms. Hood emerged from her room, the entire house smelled like bleach, and the Defendant "had cleaned everything." However, there was still blood everywhere, so she helped the Defendant clean up the blood. She stated that based upon her previous housekeeping experience, she knew that bleach was not good for floors, so she "assisted by getting Pine-Sol out." Based on the amount of blood, Ms. Hood thought initially that the Defendant had possibly cut off the victim's hand. However, her post-traumatic stress disorder "led her to not question him about anything," and she thought that the victim had gone to the hospital.

Mr. Williams returned home from work at night with Mr. Billy Patton and observed that the house had been cleaned and smelled like bleach and Pine-Sol. Mr. Williams also observed that the basement door had been nailed shut and that the victim was no longer present at the home. Mr. Williams asked the Defendant why the basement door had been shut, to which the Defendant responded that "he had some tools down there that needed protection." Days later, Mr. Williams entered the basement door and found the victim deceased in the basement. The victim suffered "40 different incised and stab wounds, consistent with the sword that was found." His throat was cut; he was disemboweled; and he had numerous defensive wounds to his hands.

The Defendant was indicted for first degree murder but pleaded guilty to second degree murder on November 23, 2021. Pursuant to the plea agreement, the Defendant agreed to the trial court determining his sentence.

The presentence report, the autopsy report, an alcohol report of the victim's blood, photographs from the crime scene, and a letter written by Ms. Anita Owenby on the Defendant's behalf were entered as exhibits to the sentencing hearing. According to the presentence report, the Defendant had been convicted of joyriding in March 2020, three counts of theft up to $500 in October 2018, violation of the financial responsibility law and possession of drug paraphernalia in April 2018, theft of property valued between $500 and $1,000 in June 2016, domestic violence in November 2012, evading arrest in October 2012, three counts of theft up to $500 in July 2011, assault in March 2011, aggravated burglary in November 2010, and three counts of assault in September 2010. He had four violations of probation between December 2011 and March 2012. There were multiple disciplinary infractions imposed during the Defendant's incarceration.

In the autopsy report, the medical examiner detailed the victim's injuries, including wounds "too numerous to count" on the victim's hands consistent with defensive injuries. The medical examiner concluded the victim died of "multiple sharp force injuries" and determined the manner of death was homicide. Photographs from the crime scene reflected two swords, a bloodied stairwell including what appears to be a bloody handprint on the wall, and wounds to the victim's face, neck, hands, and abdomen.

The Defendant presented an allocution at the sentencing hearing, stating that he did not have "a steady home" growing up and that his mother "kept bouncing custody back and forth" due to her struggles with drugs and alcohol. He said that he became addicted to drugs by the time he turned seventeen years old, which led to a "small crime spree" and going in and out of jail. He stated that in 2015 or 2016, he tried to turn his life around by embracing religion and attending church regularly. After about six months, he reunited with the victim, who was his long-time family friend and who was trying to turn his own life around. According to the Defendant, the victim tried to "clean his house up" and "get people to stop doing drugs." Since the Defendant and the victim had similar interests in abstaining from substance abuse, the Defendant moved in with the victim. A few days later, the Defendant relapsed after seeing people doing drugs, which caused a conflict between him and the victim.

The Defendant said that after a few weeks of living there, the victim returned home "severely drunk" with people whom the Defendant did not know. The victim attacked the Defendant. The Defendant "tried to back away," but the conflict escalated. The Defendant stated that "[t]here was a sword" and that while the victim was knocked to

the ground, the Defendant stood over him and put the sword to the victim's chest to stop the victim's attack. The Defendant stated that he did not realize how sharp the sword was and that the victim "grab[bed] the sword and . . . pull[ed] it up," and "[t]hat's when he sustained all those cuts from his hands." The victim stood up and was bleeding heavily but denied needing medical assistance. About "20, 30 minutes later," everyone left except for the victim, the Defendant, and Ms. Hood. While the Defendant and the victim were in the living room, the victim wielded the sword and said, "[Y]ou know I can kill you right now." The Defendant stated that he was afraid for his life, knocked the victim down, and took the sword from him. The Defendant taunted the victim with the sword, and the victim "[went] like this to smack the sword and . . . it severely cut[] him. And as soon as that happen[ed] . . . he f[ell] down and he sa[id] . . . I love you, Billy. I love you, Billy." The Defendant said at that point there was nothing he could do, so he started praying with the victim. The victim lost consciousness. The Defendant stated that his "mind[] [was] not right" because he had "been up for a few days, on drugs." The victim coughed, and believing that it was "too late," the Defendant cut the victim's throat in "an act of mercy." The Defendant dragged the victim down the stairs and nailed the door shut. He stated that, because of the grief associated with killing the victim, he tried to commit suicide by cutting his wrist and jumping off of a roof, resulting in his hospitalization and being put in a wheelchair for a period of time. He stated that he was sorry and asked for forgiveness.

Several witnesses testified on the Defendant's behalf. Ms. Anita Owenby testified that the Defendant began attending her church in June 2019. She stated that the Defendant attended regularly and served at the nursing home ministry. She drove the Defendant to and from church and church activities, and she stated the Defendant was courteous and appreciative. She recalled that on one occasion, the Defendant bought an extra meal for some visitors of the church instead of having lunch for himself. On another occasion, the Defendant bussed tables at Denny's to help the waitresses. She stated that she never saw the Defendant be aggressive or argumentative. She submitted a letter to the court, which was entered as an exhibit.

Ms. Renee Muller testified that she allowed the Defendant to live at her home about six months before the murder. He stayed for four months and was actively involved with church. She stated that the Defendant worked with her husband and was a hard worker. She believed "he was really trying," and she did not have any problems with him in her home.

Mr. Christopher Hurst testified that the Defendant was his younger brother and that he was "extremely kind." He stated that the Defendant lived with him for approximately six months in 2019 and that they worked together. The Defendant was "always involved in church" and was either there or in the gym. He did not believe the

- 4 -

murder aligned with the Defendant's character. Mr. James Benning was the Defendant's younger brother and testified that the Defendant protected him from bullies growing up. Mr. Benning stated that the victim was a great friend of his. According to Mr. Benning, the victim would let anyone stay in his home because he did not want people living on the street. He and the victim attended Alcoholics Anonymous and Narcotics Anonymous meetings together. He stated that they were all "trying to live a better life, but when these drugs and everything came in effect, it changed everybody, personalities and everything."

The trial court considered the evidence presented at the hearing, the presentence report, and the relevant sentencing factors. The court found that the Defendant was a Range I, standard offender. The court noted that the Defendant had "over a decade worth of criminal history" and that the Defendant's probation had been previously revoked and found that the Defendant "did not perform well on probation." The court also noted that the Defendant "had citations at TDOC for improper conduct." The court applied the enhancement factor that "[t]he defendant has a previous history of criminal convictions or criminal behavior, in addition to those necessary to establish the appropriate range" and gave that factor "a significant deal of weight." *See* T.C.A. § 40-35-114(1). Regarding the enhancement factor that the "victim of the offense was particularly vulnerable because of age or physical or mental disability," the court observed that the victim had "a significant blood/alcohol content" but declined to give the enhancement factor any weight because "[y]ou can't always tell someone's level of impairment based upon BAC." *See* T.C.A. § 40-35-114(4). The court observed that the victim suffered many wounds caused by a "very sharp cutting instrument," including two wounds that "would certainly likely result in the [victim's] death" and an additional twenty or more defensive wounds. The court believed that the handprint indicated the victim was probably alive when he was dragged to the basement but that the victim would not have survived for long because he suffered two wounds that would have been fatal, which likely occurred upstairs. As a result, the court applied the enhancement factor that "[t]he defendant treated, or allowed a victim to be treated, with exceptional cruelty during the commission of the offense" but gave the factor "little weight" based on its uncertainty about how long the victim suffered. *See* T.C.A. § 40-35-114(5). The court found that the Defendant possessed or employed a deadly weapon during the commission of the offense and stated that that factor was entitled to "some weight." *See* T.C.A. § 40-35-114(9). The court declined to apply the enhancement factor that "[t]he defendant had no hesitation about committing a crime when the risk to human life was high" because there was no proof that the Defendant's conduct placed the lives of people other than the victim in danger. *See* T.C.A. § 40-35-114(10).

The court considered as mitigating factors whether "[t]he defendant acted under strong provocation" and "[a]ny other factor consistent with the purposes of this chapter." *See* T.C.A. § 40-35-113(2), (13). The court declined to credit the Defendant's allocution

statement that the victim sustained wounds on his hands by grabbing the sword. The court observed that the victim suffered wounds on the fingertips, mid-range of the knuckles, and on the sides of the hands, and it found that the victim's wounds were "classic defensive wounds" that would have occurred when the victim held up his hands to defend against the Defendant's attack. Additionally, the court declined to credit the Defendant's statement that he cut the victim's neck out of mercy. The court found that the Defendant lied when stating that the victim caused his own abdominal wound by knocking the sword away because such an act could not have caused a wound that deep. The court declined to apply the mitigating factor that the Defendant acted under strong provocation. *See* T.C.A. § 40-35-113(2). The court observed that the Defendant "could have easily been convicted of first-degree murder" but that the State made a plea offer because of the lack of reliable witnesses to the crime. Accordingly, the court found that based on the circumstances of the offense and the applicable enhancement factors, the Defendant deserved a sentence at "the top of the range" for second degree murder and sentenced the Defendant to twenty-five years in confinement. The Defendant appeals.

**ANALYSIS**

The Defendant argues that his sentence was excessive because it was greater than that deserved for the offenses committed and that it was not the least severe measure necessary to achieve the purposes for which the sentence was imposed. *See* T.C.A. § 40-35-103(2), (4). He argues that his criminal history was "not particularly egregious when compared to other similarly situated offenders." T.C.A. § 40-35-102(2). The State responds that the Defendant failed to show that the trial court abused its discretion. We agree with the State.

The purpose of the laws governing sentencing in Tennessee is to promote justice. T.C.A. § 40-35-102. Additionally, the laws were enacted to "assure fair and consistent treatment of all defendants by eliminating unjustified disparity in sentencing and providing a fair sense of predictability of the criminal law and its sanctions." T.C.A. § 40-35-102(2). To that end, certain principles guide a trial court's sentencing determinations. Sentences "should be no greater than that deserved for the offense committed" and "should be the least severe measure necessary to achieve the purposes for which the sentence is imposed." T.C.A. § 40-35-103(2), (4). Additionally, punishment shall be imposed to prevent crime and promote respect for the law by "[r]estraining defendants with a lengthy history of criminal conduct." T.C.A. § 40-35-102(3)(B). "Inequalities in sentences that are unrelated to a purpose of this chapter should be avoided." T.C.A. § 40-35-103(3).

Once the trial court establishes the appropriate range of the sentence, the court must consider the following factors to determine the specific length of the sentence: the

evidence, if any, received at the trial and the sentencing hearing; the presentence report; the principles of sentencing and arguments as to sentencing alternatives; the nature and characteristics of the criminal conduct involved; evidence and information offered by the parties on mitigating and enhancement factors; any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; any statement the defendant makes on his own behalf as to sentencing; the result of the validated risk and needs assessment conducted by the department and contained in the sentencing report; and the potential for rehabilitation. T.C.A. §§ 40-35-103(5), -113, -114, -210(b)).

This court reviews the length of a sentence for abuse of discretion, applying "a presumption of reasonableness to within-range sentencing decisions that reflect a proper application of the purposes and principles of our Sentencing Act." *State v. Bise*, 380 S.W.3d 682, 707 (Tenn. 2012). A sentence will be upheld "so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." *Id.* at 709-10.

The trial court did not abuse its discretion in sentencing the Defendant. The trial court found that the Defendant was a Range I, standard offender. The Defendant was convicted of second degree murder, a Class A felony. *See* T.C.A. § 39-13-210(c)(1). The sentencing range for a Range I offender for a Class A felony is fifteen to twenty-five years. *See* T.C.A. § 40-35-112(a)(1). The trial court chose a sentence in the appropriate range when it sentenced the Defendant to twenty-five years for second degree murder.

The Defendant challenges his sentence in part by arguing that "his criminal history is not particularly egregious when compared to other similarly situated offenders." However, the court applied "a significant deal of weight" to the enhancement factor that the Defendant had a "previous history of criminal conviction or criminal behavior," citing the Defendant's decade-long criminal history and citations for misconduct while incarcerated. *See* T.C.A. § 40-35-114(1); T.C.A. § 40-35-102(3)(B). To the extent the Defendant challenges the weight that the trial court assigned to this enhancement factor, we note that the weight given to mitigating and enhancement factors is a decision "left to the trial court's sound discretion." *State v. Carter*, 254 S.W.3d 335, 345 (Tenn. 2008). Accordingly, "this court is not free to reevaluate the weight and value assigned to the factors found by the trial court." *State v. Edward Rudolph Wyse, Jr.*, No. E2019-01454-CCA-R3-CD, 2020 WL 6141011, at *13 (Tenn. Crim. App. Oct. 20, 2020), *no perm. app. filed*; *see Bise*, 380 S.W.3d at 699. The court applied the enhancement factor that "[t]he defendant treated, or allowed a victim to be treated, with exceptional cruelty during the commission of the offense" but gave the factor "little weight" based on its uncertainty about how long the victim suffered. *See* T.C.A. § 40-35-114(5). The court also found that the Defendant possessed or employed a deadly weapon during the commission of the

offense and applied "some weight" to that factor. *See* T.C.A. § 40-35-114(9). The Defendant does not challenge the court's application of the enhancement factors.

The Defendant also argues that his punishment was excessive because the victim "was a combative drunk and that he attacked [the Defendant] again and again on" the day of the killing, but the court declined to credit the Defendant's characterization of the killing provided during his allocution. The court found that the victim suffered more than twenty defensive wounds, that the cut on the victim's abdomen would not have been caused by the victim knocking the sword away, and that the Defendant did not cut the victim's neck in an act of mercy. Accordingly, the court declined to apply the mitigating factor that the Defendant acted under strong provocation. *See* T.C.A. § 40-35-113(2). The Defendant does not challenge the trial court's failure to apply this mitigating factor. The court found that the circumstances of the offense merited a first degree murder charge but that the State offered a plea to second degree murder due to the unavailability of reliable witnesses. As a result, the court considered the seriousness of the Defendant's conduct and determined that the Defendant deserved a sentence on the top end of the sentencing range based on the circumstances of the offense and its application of the enhancement factors. *See* T.C.A. §§ 40-35-102(1), -103(2), (4), -210(b)(1), (4). The Defendant has not shown that the trial court improperly applied the purposes and principles of sentencing. *See Bise*, 380 S.W.3d at 709-10. Therefore, the Defendant failed to show the trial court abused its discretion.

## CONCLUSION

Based upon the foregoing reasons, we affirm the judgment of the trial court.

_____
JOHN EVERETT WILLIAMS, PRESIDING JUDGE